UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

HOWARD PORTER,

                     Plaintiff,                  **MEMORANDUM AND ORDER**

           - against -

                                                         1:03-cv-6463-ENV-LB

CITY OF NEW YORK, WILLIAM BELL,
ADMINISTRATION FOR CHILDREN'S
SERVICES, MICHAEL BLOOMBERG,
JACQUELINE FUENTES, ANTILLA
CALDWELL, DANA WEBER and JOHN
(JANE) DOE,

                     Defendants.

------------------------------------------------------X

VITALIANO, D.J.

        Plaintiff Howard Porter commenced this action *pro se* on December 18, 2003, pursuant to 42 U.S.C. § 1983, alleging that defendants violated his constitutional rights when they wrongly removed R.B., his 10-year-old son, from his custody. Plaintiff filed an amended complaint on September 20, 2004 and a second amended complaint on April 15, 2005, each containing essentially the same allegations as plaintiff's original complaint. Plaintiff alleges that Administration for Children's Services ("ACS") caseworkers Jacqueline Fuentes ("Fuentes"), Antilla Caldwell ("Caldwell"), and Dana Weber ("Weber") removed R.B. from his custody without having first sought a pre-deprivation hearing or having found evidence of an immediate threat of harm that would warrant immediate removal. Plaintiff also claims that he was denied a prompt post-deprivation hearing, in violation of his due process and state statutory rights. Plaintiff maintains that these violations were the result of the custom and practice of the City of New York and ACS. Defendants now move for summary judgment.

For the reasons set forth below, defendants' motion is granted in full and plaintiff's claims are dismissed.

## BACKGROUND

Plaintiff and Maria Briggs ("Briggs") are the natural parents of R.B. A 1995 New York State Family Court order gave full custody of R.B. to plaintiff, who lived with the child's paternal grandparents, while allowing Briggs visitation rights. On September 29, 2003, Briggs called the New York State Office of Children and Family Services, alleging that plaintiff had inadequately supervised R.B. Specifically, Briggs claimed that plaintiff and his parents were often intoxicated and would drive drunk with R.B. in the car.

Defendant Jacqueline Fuentes, an ACS caseworker, visited plaintiff's residence on the same day that Briggs made her neglect report. During the visit, R.B.'s paternal grandmother smelled of alcohol, and R.B. reported that she would often drink a lot of wine, so much on one occasion that he had to call an ambulance out of fear that she had died after passing out. Despite this report, Fuentes concluded that plaintiff's home appeared safe, with adequate accommodations for R.B.

The neglect report having yielded no change in R.B.'s custody status, Briggs next filed a custody petition in the New York State Family Court, pursuant to Article 6 of the New York Family Court Act, on October 6, 2003. The petition raised the same issues as the earlier neglect report, namely, that the child's primary caretakers – plaintiff and his mother – frequently became intoxicated and engaged in behavior that endangered R.B. The court ordered ACS to conduct a child protective investigation, and on October 15, 2003, the court ordered ACS to update its investigation to address newly-obtained information that federal authorities were prosecuting plaintiff on obscenity charges. Plaintiff had, in fact, been convicted of seven counts of possession of child pornography and three

counts of distribution of child pornography, and he was to be sentenced in the Eastern District of New York on January 8, 2004.

Fuentes (the ACS caseworker) made a follow-up visit to plaintiff's residence on October 17, 2003 and found R.B. alone with his paternal grandmother,[1] who was visibly drunk: she reeked of alcohol, babbled nonsense, and had a flushed complexion. Neither she nor R.B. could open the door, and a next-door neighbor had to do so with a spare key. Citing this incident, as well as plaintiff's criminal conviction and alleged history of drunkenness, Fuentes determined that the child was in imminent danger and had to be removed from the home immediately. Given that the time was 4:20 p.m. on a Friday, Fuentes determined that there was not enough time to seek a court order to temporarily remove R.B. The child was removed, and Fuentes left a written notice of temporary removal and hearing, which plaintiff read upon arriving home at 2 a.m. on October 18, 2003. After the removal, Fuentes called R.B.'s mother and, upon her recommendation, placed R.B. with his maternal great-aunt, Debra Boyle ("Boyle"), in New Jersey. There is no evidence in the record that Fuentes made any additional efforts at this time to inform plaintiff of the removal.

On the morning of Monday, October 20, 2003 – the next business day following removal – ACS filed a neglect petition against plaintiff in New York State Family Court, pursuant to Article 10 of the New York Family Court Act. In an interview with Fuentes, plaintiff had admitted his mother's drinking problem and stated that "[f]or about a year I told her she is going to be the cause of me losing [R.B.] if she doesn't stop this." Conway Decl., Exh. G, at 3. Plaintiff added that he had been fighting with his mother because she had refused to seek help for her drinking problem; he planned to give

---

[1] The record suggests that Fuentes was the lead caseworker on plaintiff's case. Plaintiff claims that defendants Caldwell and Weber were present on October 17, 2003, and in moving for summary judgment, defense counsel does not contend that either of these defendants lacked involvement in the claimed constitutional violations.

guardianship to R.B.'s maternal great-aunt, Boyle, before leaving for prison. On the same day that Fuentes filed the Article 10 petition, a preliminary hearing was held at the Richmond County Family Court. Plaintiff proceeded *pro se* at the short hearing, which was adjourned to October 22, 2003, when plaintiff would have counsel available to him. The court entered a temporary order of protection against plaintiff, requiring him to stay away from R.B. Plaintiff consented to R.B. being paroled to the custody of Boyle in New Jersey. He also accepted service of Briggs's Article 6 custody petition.

On October 22, 2003, the Richmond County Family Court continued the preliminary hearing, and the parties agreed that a full hearing would be conducted at 9:15 a.m. on October 30, 2003. Despite plaintiff withdrawing his consent to R.B.'s continued placement with Boyle and insisting upon the return of his child, the court issued Boyle a temporary order of custody. On the same day, Boyle filed her own petition for custody of R.B., pursuant to Article 6 of the Family Court Act. At the next scheduled court date, October 30, 2003, plaintiff failed to appear; he could not be found in the courthouse at approximately 9:30 a.m. and the court concluded that a hearing would not be necessary. The matter was adjourned to December 12, 2003, when the court again adjourned proceedings to February 11, 2004 due to plaintiff's impending sentencing in federal court. Plaintiff was subsequently imprisoned and the record does not show whether the February 11th conference was ever held, or whether plaintiff ever renewed his request for a hearing to address matters of custody.

The record does show that a custody proceeding was held on September 21, 2004 and that the family court granted custody of R.B. to Boyle, with the consent of both R.B.'s biological mother and guardian *ad litem*, Mario Acunzo. Plaintiff, who was at this time incarcerated, objected through his attorney and stated that R.B. should be placed in the custody of his paternal grandparents. The court rejected R.B.'s plan because ACS had found substantiated cases of child neglect against the paternal

grandparents and had threatened to bring an Article 10 petition if they were granted custody. Plaintiff's counsel raised a due process objection, to which the court responded that it did "not see any further utility in having a hearing when an incarcerated father under the facts of this case, and this is obviously without prejudice to Mr. Porter's rights when he is released, and on that point, I think I had given it." Conway Decl., Exh. P, at 10:12-17. The family court's written order mistakenly stated that the grant of custody had been by default, see Conway Decl., Exh. O, and the New York Supreme Court, Appellate Division, Second Department thus refused to entertain plaintiff's appeal. See N.Y. C.P.L.R. 5511 ("An aggrieved party or a person substituted for him may appeal from any appealable judgment or order *except one entered upon the default of the aggrieved party*.") (emphasis added).[2] With the grant of custody to Boyle, ACS withdrew its neglect petition against plaintiff.

## DISCUSSION

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing the merits of a summary judgment motion, "the court cannot try issues of fact but can only determine whether there are issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). In determining whether the moving party has met this burden, a court must construe all evidence in a light most

---

[2] The record is silent as to whether plaintiff took any action to seek correction of the erroneous family court judgment entry prior to taking an appeal from the judgment.

favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). This means that the nonmoving party may not rely on "conclusory statements, conjecture, or speculation." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996); Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Ultimately, the court is left to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

I. **Plaintiff Presents No Evidence of a Constitutional Violation**

   A. *Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Parents possess a fundamental liberty interest in the "care, custody and control of their children." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); Tenenbaum v. Williams, 193 F.3d 581, 594 (2d Cir. 1999). This liberty interest is "perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court. Troxel, 530 U.S. at 65. Ordinarily, then, a parent must be accorded due process, in the form of a court hearing, before being deprived of the care, custody, and control of their children. Tenenbaum, 193 F.3d at 593. If there is an emergency, *i.e.*, if the child faces an imminent risk of harm, "a child may be taken into custody by a responsible State

6

official without court authorization or parental consent." Id. at 594. Due process is, in this circumstance, satisfied by a prompt post-deprivation hearing. Gottlieb v. County of Orange, 84 F.3d 511, 520 (2d Cir. 1996); Arredondo v. Locklear, 462 F.3d 1292, 1298 (10th Cir. 2006); K.D. v. County of Crow Wing, 434 F.3d 1051, 1056 n.6 (8th Cir. 2006).

The Second Circuit has elaborated that an emergency warranting the immediate removal of a child is present when: "(1) an 'immediate threat to the safety of the child' exists, or (2) 'the child is left bereft of care and supervision,' or (3) there is 'evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence.'" Johnson v. New York, No. 04-cv-1070, 2007 WL 764514, at *5 (E.D.N.Y. Mar. 9, 2007) (quoting Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir. 1991)); Cecere v. City of New York, 967 F.2d 826, 829 (2d Cir. 1992). The question on a summary judgment motion is whether a rational juror "could not fail to conclude that defendants had an objectively reasonable basis for believing that the prompt separation of [R.B. from plaintiff], without pausing to obtain a court order, was necessary." See Gottlieb, 84 F.3d at 520; see also Kia P. v. McIntyre, 235 F.3d 749, 758-59 (2d Cir. 2000) (substantive due process satisfied where caseworkers have "reasonable basis" for their findings).

Based on the evidence in the record, a rational juror would have no choice but to conclude that defendants' decision to remove R.B. was objectively reasonable. ACS had received a report that plaintiff and his parents would often drink to the point of intoxication; drive drunk with R.B.; and that R.B. would be left alone with his grandmother who would drink to the point of incapacitation, requiring R.B. on at least one occasion to call for medical help. R.B. substantiated this report. The ACS visit of October 17, 2003 provided further substantiation, as R.B. was found alone with his paternal grandmother, who was severely intoxicated – to the point that she babbled words and was

7

unable to open the home's door, necessitating assistance from a neighbor. Plaintiff offers no admissible proof to contest any of this, *i.e.*, he offers neither affidavits nor testimony from his mother, neighbor, R.B., or any of the caseworkers or police officers present when R.B. was removed. Plaintiff offers only speculation. He claims that R.B. was removed solely because plaintiff was convicted in federal court for possessing and distributing child pornography. Yet, plaintiff's statements to ACS contradict this claim. He concedes that his mother refused to seek help for her drinking problem, which had caused him to fear that his mother's drunkenness might lead to him losing custody of R.B. Based on the uncontroverted evidence, ACS undoubtedly had an objectively reasonable basis for believing that R.B. could not be left with his grandmother. The situation posed a serious threat to R.B.'s safety; the only observable care or supervision was that which R.B. was providing for his intoxicated grandmother. No one was present in the home to supervise R.B. It being 4:20 p.m. on a Friday, defendants reasonably determined that it was too late to seek an emergency order from the family court. Plaintiff has presented no evidence that the family court would have been available to entertain an emergency request after the close of business hours on a Friday or that the post-deprivation hearing held on Monday morning could have been held any earlier.

Furthermore, a reasonable juror could not find that the ACS caseworkers lacked an objectively reasonable basis for removing the child altogether rather than attempting to locate plaintiff. The facts available to the caseworkers at the time demanded this decision. The statements of R.B. and reports to ACS strongly suggested that the observed episode was more the norm than the exception. Accordingly, the caseworkers could have no confidence that plaintiff, who had created the emergency situation by placing his child with an individual who had a known drinking problem, would have taken steps to remedy the situation. The caseworkers had more than sufficient reason to believe that a

8

pattern of neglect existed. This Court concludes then, as a matter of law, that the removal of R.B. did not violate plaintiff's procedural or substantive due process rights.

The Court similarly finds unavailing plaintiff's claim that defendants violated his procedural due process rights by temporarily placing R.B. in the custody of Boyle, his great-aunt, who lived in New Jersey. The placement may have violated Section 1024 of the New York Family Court Act, which requires that a child removed on an emergency basis be brought "immediately to a place approved for such purpose by the local social services department." N.Y. Fam. Ct. Act § 1024(b). Section 1024 gives ACS caseworkers no authority to place a child with a family member of their choosing or to remove the child from New York state. Further, New York law limits ACS's ability to place a child with a relative in another state. N.Y. Soc. Serv. Law § 374-a.[3] ACS has admitted as much. See Conway Decl., Exh. L, at 24:2-6 ("I did not realize that my client had done -- had put the child in a home in New Jersey. I missed that issue. Otherwise, I probably would have told them that they can't place a child.").

Yet, "[f]ederal constitutional standards rather than state statutes define the requirements of procedural due process." Robison v. Via, 821 F.2d 913, 923 (2d Cir. 1987) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 540-41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). The emergency placement of a child into the custody of a relative in another jurisdiction may in some cases impede the parent's opportunity to obtain prompt judicial review, for example, where the relative absconds with the child or simply refuses to return the child. Due process is violated where the state disregards this risk and the parent is deprived of a prompt hearing. See, e.g., Suboh v. Dist. Attorney's Office of

---

[3] This Court offers no opinion as to whether a private state law cause of action may arise from defendants' failure to comply with the state statutes.

Suffolk Dist., 298 F.3d 81, 92 (1st Cir. 2002); Weller v. Dep't of Soc. Servs., 901 F.2d 387, 396 (4th Cir. 1990); Hooks v. Hooks, 771 F.2d 935, 942-43 (6th Cir. 1985); Morrison v. Jones, 607 F.2d 1269, 1275 (9th Cir. 1979).

Before temporarily placing R.B., ACS learned that he spent much time at his great-aunt's house and was thus accustomed to visiting with her. R.B. told Fuentes that "he has a good time at her home and he loves going there." Conway Decl., Exh. G, at 3. The ACS caseworker had visited the home and found it to be an appropriate temporary placement. There was no indication that Boyle had any intention of absconding with R.B. or refusing to return him to New York; her track record clearly dispelled any such suspicion. As expected, Boyle appeared at the Richmond County Family Court on Monday, October 20, 2003, at which time, plaintiff consented to her continued custody of R.B., thus implicitly acknowledging this placement to be in the best short-term interest of the child. The uncontroverted evidence shows that there was no appreciable risk that R.B.'s great-aunt would refuse to return him to New York state and, more to the point of harm, Boyle in no way impeded plaintiff's ability to be heard before the Richmond County Family Court on October 20, 2003. In sum, this Court cannot find that defendants' apparent violations of state statutes amounted to a violation of federal constitutional law.

B.   *Equal Protection*

In opposing defendants' motion for summary judgment, plaintiff for the first time claims that the removal of R.B. from his custody violated the Equal Protection Clause of the Fourteenth Amendment. The Court preliminarily notes its earlier denial of plaintiff's request to amend his complaint for a third time. Regardless, an Equal Protection claim would clearly fail on the record before the Court. Plaintiff would, it seems, allege that ACS discriminates against men and/or those

charged with child pornography offenses. To support his claim, he cites a single instance in which ACS determined that a neglect report brought against Briggs was unfounded. That report did not involve drunkenness, an emergency situation, or anything akin to the situation at plaintiff's household on October 20, 2003. Obviously, a single isolated finding by ACS, on a much different set of facts, that a neglect claim brought against a woman was unfounded is not enough to create a triable issue on an Equal Protection claim.

C. *Qualified Immunity*

Even assuming *arguendo* that the ACS caseworkers violated plaintiff's constitutional rights, the caseworkers would still be entitled to qualified immunity at the summary judgment stage. Qualified immunity applies to suits against state officials for acts in the course of their duties that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Cartier v. Lussier, 955 F.2d 841, 843 (2d Cir. 1992) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It applies when either: (i) the state official did not violate a clearly established right; or (ii) it was objectively reasonable for the state official to believe that he was not violating a clearly established right. Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003). "The objective reasonableness test is met–and the defendant is entitled to immunity–if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The Second Circuit has recognized the important role that qualified immunity plays in the area of child protective care:

> [P]rotective services caseworkers [must] choose between difficult alternatives .... If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of

11

> infringing the child's rights. It is precisely the function of qualified
> immunity to protect state officials in choosing between such alternatives,
> provided that there is an objectively reasonable basis for their decision,
> whichever way they make it.

Tenenbaum, 193 F.3d at 596 (quoting van Emrik v. Chemung County Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990)) (alterations in original). Again, this Court need not reach the issue of qualified immunity because defendants' actions were clearly reasonable. If the Court were to reach the issue, however, it would find that defendant-caseworkers are entitled to qualified immunity.

## II. Plaintiff Presents No Evidence of a Municipal Policy or Custom

Assuming *arguendo* that the ACS caseworkers violated plaintiff's constitutional rights, the City of New York would still not be liable for its employees' acts. It is black-letter law that a municipality may not be held liable for its employees' constitutional violations under a general *respondeat superior* theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id.; see also Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."). A plaintiff may prove a municipal policy or custom by showing that: (i) the employees' unconstitutional acts are "officially sanctioned or ordered" by the municipality; (ii) "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law"; or (iii) the unconstitutional acts were by individuals with "final policymaking authority." Pugliese v. Long Island R.R. Co., No. 01-cv-

7174, 2006 WL 2689600, at *3 (E.D.N.Y. Sep. 19, 2006) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). And to be clear, it is the plaintiff's burden to establish municipal liability. Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).

Plaintiff's claim against the City of New York is doomed by his failure to produce proof of any sort to support his conclusory allegations. Plaintiff has produced no evidence of an unconstitutional policy or custom, nor does he present proof that would link any ACS policy or custom to the caseworkers' decision to remove R.B. See Monell, 436 U.S. at 694 (policy or custom must be "the moving force [behind] the constitutional violation"). Empty claims are simply not enough to defeat a properly supported summary judgment motion. See Shapiro v. Kronfeld, No. 00-cv-6286, 2004 WL 2698889, at *22 (S.D.N.Y. Nov. 24, 2004) (unsupported allegations regarding ACS policy are insufficient to establish municipal liability). Plaintiff's claims against the City of New York cannot survive summary judgment.

### III. Plaintiff Cannot Sue A City Agency

Plaintiff has named ACS as a defendant. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." Johnson, 2007 WL 764514, at *5. Claims against the City of New York's agencies are deemed to be claims against the City of New York, and it is well-established that ACS cannot be sued directly. Id.; Preston v. City of New York, 223 F. Supp. 2d 452, 469 (S.D.N.Y. 2002). Accordingly, plaintiff's claim against ACS is dismissed.

### IV. Plaintiff Cannot Sue Supervisors Who Had No Personal Involvement in the Alleged Constitutional Violations

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to

13

an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Personal involvement of a supervisory official may be established by showing that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright, 21 F.3d at 501). Plaintiff has presented no evidence whatsoever that defendants Michael Bloomberg, (Mayor of the City of New York) or William Bell (former commissioner of ACS) were in any way personally involved in the alleged violation of his constitutional rights. In fact, plaintiff's second amended complaint makes absolutely no allegations against these two defendants. A plaintiff cannot stave off summary judgment merely by offering conclusory allegations that such high-ranking officials failed to train, supervise, or discipline employees; were negligent in hiring and retaining employees; failed to enforce the law; were generally negligent in the performance of their duties; or exhibited reckless disregard for the rights of the public. Younger v. City of New York, 480 F. Supp. 2d 723, 733 (S.D.N.Y. 2007). The claims against Bloomberg and Bell are, accordingly, dismissed.

V.  **Remaining Claims**

On March 1, 2004, the Honorable Sterling Johnson, Jr. dismissed plaintiff's request for a declaration that the New York State Family Court's decision in his case was unconstitutional. Judge Johnson noted that plaintiff had twice before brought unsuccessful federal actions seeking review of

state family court orders. Judge Johnson also held that plaintiff could not, while proceeding *pro se*, advance claims belonging to his minor child. To the extent that plaintiff attempts to relitigate these issues in opposing defendants' motion for summary judgment, his claims are rejected. Furthermore, to the extent that plaintiff seeks to revive his claims against previously dismissed defendants Terrence J. McElrath (judge in his family court proceeding), Mario Acunzo (R.B.'s guardian *ad litem*), or John Papajik (attorney for ACS in plaintiff's family court proceeding), this Court finds absolutely no basis in the record or in law upon which plaintiff would have valid grounds to do so.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and this action is dismissed. The Clerk of the Court is directed to close this case. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this Memorandum and Order would not be taken in good faith.

**SO ORDERED.**

Dated: Brooklyn, New York
June 14, 2007

s/Hon. Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge